Anderson, Appellee, *v.* Jacobs, Appellant.

(No. 80-1688—Decided November 18, 1981.)

*Mr. Richard B. Hauser,* prosecuting attorney, and *Mr. Dennis B. Trimboli,* for appellee.

*Mr. John M. Coyne,* for appellant.

SWEENEY, J. On June 1, 1981, the United States Supreme Court handed down its unanimous decision in *Little* v. *Streater* (1981), _____ U. S. _____, 68 L. Ed. 2d 627. *Little* involved a constitutional challenge to Connecticut's paternity procedures. The court held that "in these specific circumstances***to deny appellant [an indigent paternity defendant] blood grouping tests because of his lack of financial resources violated the due process guarantee of the Fourteenth Amendment." *Id.* at page 639 (footnote omitted). The question thus arises as to whether Ohio procedures relating to blood grouping tests in paternity actions are sufficiently

similar to Connecticut procedures so as to make *Little, supra,* binding precedent.

## I.

The Fourteenth Amendment provides in relevant part: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." Appellant argues that the lower courts' refusal to authorize blood grouping tests without prepayment thereof violated his right to due process. Specifically, appellant claims that the courts below denied him "fundamental fairness" and "a meaningful opportunity to be heard." See *Boddie* v. *Connecticut* (1971), 401 U. S. 371, 377.

The United States Supreme Court analyzed the due process claim in *Little* with reference to the three-pronged standard enunciated in *Mathews* v. *Eldridge* (1976), 424 U. S. 319, at page 335:[8]

"\*\*\*\*[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Before applying the *Eldridge* test the court briefly reviewed these three relevant matters: "the unique quality of blood grouping tests as a source of exculpatory evidence, the State's prominent role in the litigation, and the character of paternity actions under Connecticut law." *Little, supra,* at pages 632-633.

With respect to the evidentiary value of blood grouping test results, the Supreme Court, at page 633, cited the following comment on their widespread acceptance in legal and scientific circles:

" 'As far as the accuracy, reliability, dependability—even infallibility—of the test are concerned, there is no longer any controversy. The result of the test is universally accepted by

---

[8] *Eldridge* dealt with the process due a recipient of Social Security disability payments prior to the termination of his benefits.

distinguished scientific and medical authority. There is, in fact, no living authority of repute, medical or legal, who may be cited adversely . . . . [T]here is now . . . practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity.' 1 S. Schatkin, Disputed Paternity Proceedings § 9.13 (1975)."

The court also emphasized the state's involvement in the litigation:

"***Because appellee's child was a recipient of public assistance, Connecticut law compelled her, upon penalty of fine and imprisonment for contempt, 'to disclose the name of the putative father under oath and to institute an action to establish the paternity of said child.'***The State's Attorney General automatically became a party to the action, and any settlement agreement required his approval or that of the Commissioner of Human Resources or Commissioner of Income Maintenance.***The State referred this mandatory paternity suit to appellee's lawyer 'for prosecution' and paid his fee as well as all costs of the litigation.***In addition, the State will be the recipient of the monthly support payments to be made by appellant pursuant to the trial court's judgment***. 'State action' has undeniably pervaded this case." *Id.* at pages 634-635.

Regarding the character of Connecticut paternity proceedings, the court looked to the " 'quasi-criminal' overtones," as exemplified by the language of the statute (if a putative father "is found guilty") and by the possible imprisonment of adjudged fathers who fail to comply with support orders. *Id.* at 635. The court also discussed an "unusual evidentiary obstacle" facing defendants in Connecticut paternity actions. Under Connecticut law if the complainant mother "continues constant in her accusation, it shall be evidence that the respondent [defendant] is the father of such child." Conn. Gen. Stat. Section 46b-160 (1981). As interpreted by the Connecticut courts this statute "places upon the reputed father the burden of showing his innocence of the charge***by other evidence than his own." *Mosher* v. *Bennett* (1929), 108 Conn. 671, 674, 144 A. 297. The United States Supreme Court noted that "***[i]n substance, the State has created an adverse

presumption regarding the defendant's testimony by elevating the weight to be accorded the mother's imputation of him. If the plaintiff has been 'constant' in her accusation of paternity, the defendant carries the burden of proof and faces severe penalties if he does not meet that burden and fails to comply with the judgment entered against him." *Little, supra,* at page 636.

Reviewing these matters from an Ohio perspective it first becomes evident that blood grouping tests competently administered in Ohio will provide no less accurate and probative evidence than blood tests performed in Connecticut. The pervasiveness of state involvement in the instant case is comparable to Connecticut's involvement in *Little,* although there are certain points of distinction in the practices of the respective states.[9]

Paternity proceedings in Ohio differ somewhat from Connecticut paternity actions in that an Ohio putative father is not subjected to the conclusive presumption of paternity established by Conn. Gen. Stat. Section 46b-160 (1981). Moreover, Ohio law is less imbued with "quasi-criminal overtones" than the Connecticut statutes at issue in *Little* if we assume, *arguendo,* that the criminal law terminology contained in R. C. Chapter 3111 is merely vestigial,[10] and the criminal penalties contemplated by R. C. 3111.17 and 3111.18 are unconstitutional for the reasons expressed in *Walker* v. *Stokes* (1977), 54 Ohio App. 2d 119.[11]

[9] For example, in Connecticut the complainant mother receiving public assistance is represented by a private attorney who is paid by the state, whereas in Ohio the complainant is represented by the prosecutor's office. ODPAM Section 8404.5. Both states, however, require a complainant to assign any support rights she may be awarded (see R. C. 5107.07 and *Little* at pages 634-635) in order to remain eligible for public assistance and both impose sanctions on an unwed mother who refuses to cooperate in establishing paternity (see ODPAM Section 314.12 and *Little* at page 634).

[10] See, *e.g.,* R. C. 3111.08 ("accused to furnish bail"); R. C. 3111.15 ("[i]f the accused pleads not guilty").

[11] Inasmuch as our decision in this cause does not turn on whether the instant paternity proceedings are characterized as "quasi-criminal" or "quasi-civil," we find it unnecessary to express an opinion on the constitutionality of R. C. 3111.17 and 3111.18, adhering to our well-settled rule "not to decide constitutional questions unless absolutely necessary." *State, ex rel. Hofstetter,* v. *Kronk* (1969), 20 Ohio St. 2d 117, 119. See, also, *Euclid* v. *Heaton* (1968), 15 Ohio St. 2d 65; *Greenhills Home Owners Corp.* v. *Greenhills* (1966), 5 Ohio St. 2d 207, paragraph one of the syllabus.

In sum, the only discernible difference between the position of the appellant herein and the position of the appellant in *Little* concerns the character of paternity proceedings in Ohio and Connecticut respectively. The cases cannot otherwise be distinguished. With these matters in mind we turn to the *Mathews* v. *Eldridge* analysis.

## II.

To reiterate, the *Eldridge* test requires a court to balance three interests in determining what process is constitutionally due: "[1] the private interests at stake; [2] the risk that the procedures used will lead to erroneous results and the probable value of the suggested procedural safeguard; and [3] the governmental interests affected." *Little, supra,* at page 636.

## II A.

The Supreme Court in *Little,* at page 637, analyzed the private interests at stake in this manner:

"The private interests implicated here are substantial. Apart from the putative father's pecuniary interest in avoiding a substantial support obligation and liberty interest threatened by the possible sanctions for noncompliance, at issue is the creation of a parent-child relationship. This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. See *Stanley* v. *Illinois,* 405 U. S. 645, 651-652 \* \* \*(1972). Just as the termination of such bonds demands procedural fairness, see *Lassiter* v. *Department of Social Service,* _____ U. S. _____, 68 L. Ed. 2d 640 \* \* \*(1981), so too does their imposition. Through the judicial process, the State properly endeavors to identify the father of a child born out of wedlock and to make him responsible for the child's maintenance. Obviously, both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination."

While each of the three private interests catalogued by the court in the above passage is "substantial," only the third interest, that touching on "the creation of a parent-child relationship," was held to be "compelling." We take the term "compelling" to mean that the primary private interest attending a paternity action concerns the creation of the parent-child relationship. Appellant herein has the same "compelling

interest in the accuracy of such a [paternity] determination" as the putative father had in *Little.* As for the other private interests discussed in *Little,* appellant surely faces "a substantial support obligation," even if, *arguendo,* it would be constitutionally impermissible to jail him for noncompliance with a support order by reason of his indigency.

## II B.

The second prong of the *Eldridge* test concerns the risk of erroneous deprivation and the probative value of the proposed additional procedure. In *Little,* at page 637, the Supreme Court offered this analysis as its second step:

"Given the usual absence of witnesses, the self-interest coloring the testimony of the litigants, and the State's onerous evidentiary rule and refusal to pay for blood grouping tests, the risk is not inconsiderable that an indigent defendant in a Connecticut paternity proceeding will be erroneously adjudged the father of the child in question.***Further, because of its recognized capacity to definitively exclude a high percentage of falsely accused putative fathers, the availability of scientific blood test evidence clearly would be a valuable procedural safeguard in such cases.***Unlike other evidence that may be susceptible to varying interpretation or disparagement, blood test results, if obtained under proper conditions by qualified experts, are difficult to refute. Thus, access to blood grouping tests for indigent defendants such as appellant would help to insure the correctness of paternity decisions in Connecticut."

With the exception of the language dealing with Connecticut's "onerous evidentiary rule," all the factors discussed by the Supreme Court apply to the case at bar. Although the court acknowledged Connecticut's one-sided evidentiary rule, the most important factor bearing on its "risk of an erroneous deprivation" determination was the near irrefutability of blood grouping test results. Ohio, of course, has long recognized the probative value of blood test results. See *State, ex rel. Walker,* v. *Clark* (1944), 144 Ohio St. 305.

## II C.

The third *Eldridge* criterion, the state's interest, was discussed in these terms, at pages 637-638, in *Little:*

"The State admittedly has a legitimate interest in the

welfare of a child born out of wedlock who is receiving public assistance, as well as in securing support for the child from those legally responsible. In addition, it shares the interest of the child and the defendant in an accurate and just determination of paternity.***Nevertheless, the State also has financial concerns; it wishes to have the paternity actions in which it is involved proceed as economically as possible and, hence, seeks to avoid the expense of blood grouping tests."

However, the court determined, at page 638, that "the state's monetary interest 'is hardly significant enough to overcome private interests as important as those here.' "

### II D.

Upon weighing the three *Eldridge* factors, the *Little* court, at pages 638-639, concluded:

"***Without aid in obtaining blood test evidence in a paternity case, an indigent defendant, who faces the State as an adversary when the child is a recipient of public assistance and who must overcome the evidentiary burden Connecticut imposes, lacks 'a meaningful opportunity to be heard.'*** Therefore, 'the requirement of "fundamental fairness" ' expressed by the Due Process Clause was not satisfied here."

For reasons hereinbefore discussed, we do not find that the absence in Ohio of a burdensome Connecticut-style evidentiary rule in paternity cases is a sufficient basis to distinguish the *Little* case from the case *sub judice*. The various factors considered by the Supreme Court in *Little* were treated cumulatively, but the court placed special emphasis on these three: (1) the importance of the parent-child relationship, (2) the unquestioned exculpatory value of blood grouping tests, and (3) the pervasiveness of the state's involvement in the proceedings. The instant case is on all fours with *Little* on these controlling points and, therefore, we are constitutionally bound to reverse the Court of Appeals. We hold that the denial of blood grouping tests to an indigent paternity defendant, who is unable to prepay for such tests and who faces the state as an adversary when the complainant mother and her child are recipients of public assistance, violates the due process guarantee of the Fourteenth Amendment to the United States Constitution.[12]

---

[12] We have disposed of this cause on due process grounds and, therefore, find it unnecessary to reach appellant's equal protection claim.

We should note that we do not hereby impose a constitutional duty on the state to provide blood grouping tests for indigent defendants in ordinary paternity proceedings between private parties. *Cf. Little* at page 635. Rather, our holding is limited to cases, like the one at bar, that are suffused with state action by virtue of the state's multiplicitous involvement as the provider of public assistance, as the assignee of any support rights a court may order, and finally as the legal representative of the complainant mother.

The judgment of the Court of Appeals is reversed and the cause remanded to the trial court. On remand the court shall order the blood grouping tests requested by appellant. The fees for the tests shall be paid initially by the county. At the close of the litigation, pursuant to R. C. 3111.16, "[t]he court shall determine how and by whom the costs of the tests shall be paid."

> *Judgment reversed and*
> *cause remanded.*

CELEBREZZE, C. J., W. BROWN, LOCHER and PATTON, JJ., concur.

HOLMES and KRUPANSKY, JJ., dissent.

PATTON, J., of the Eighth Appellate District, sitting for C. BROWN, J.

HOLMES, J., dissenting. The majority opinion, in the main, relies upon the holding of the United States Supreme Court in *Little* v. *Streater* (1981), _____ U. S. _____, 68 L. Ed. 2d 627, as being the controlling precedent for the determination of this case. I respectfully suggest that *Little* v. *Streater,* which dealt with the particular nature of Connecticut law, and not Ohio law, relating to paternity proceedings brought by recipients of ADC funds, may be distinguished by virtue of the difference of the laws of these two states.

Initially, a paternity proceeding in Ohio is a civil action, not a criminal action. The fundamental purpose of such an action is to identify by the weight of the evidence the father of a child born out of wedlock. There is no criminal aspect to such proceeding; nor may the father, once determined to be such, be incarcerated for failure to pay the support for the child, if the father is shown to be indigent as in the instant case.

In contrast, the Supreme Court in *Little* v. *Streater,* as noted by the majority here, characterized the Connecticut statutes in terms of the "quasi-criminal overtones" as exemplified by the language of the statute, if the putative father "is found guilty," and by the possible imprisonment of adjudged fathers who fail to comply with support orders.

Of even greater significance in the differentiation between the Connecticut and Ohio paternity statutes, which reasonably impelled the Supreme Court to sail the constitutional tack it did, was the "unusual evidentiary obstacle" facing the alleged father defendants in Connecticut paternity actions. As set forth by the majority here, the Supreme Court in *Little* v. *Streater* called specific attention to the fact that the Connecticut statute, as interpreted by the Connecticut courts, " 'places upon the reputed father the burden of showing his innocence of the charge***by other evidence than his own.' " *Id.* at 635. The Supreme Court also noted that: "In substance, the State has created an adverse presumption regarding the defendant's testimony by elevating the weight to be accorded the mother's imputation of him." *Id.* at 636.

I conclude that the discernible differences between the Connecticut and Ohio statutes are rather substantial, and would hold that the denial of prepaid blood grouping tests to an alleged father in an ADC paternity action is not a denial of the defendant's due process rights.

If the state desires to permit the prepayment of blood grouping tests as a part of the costs of the paternity proceeding, it, acting through the General Assembly, could very well so provide within the chapter of law involved or in other sections of law. The General Assembly has not chosen to do that, and this court, or other courts, should not take it upon themselves to do so. The state is presently far too burdened with the multifarious costs of litigation at all levels, civil as well as criminal, and should not be further burdened unless the costs are legislatively established as a public policy. In this regard, I reiterate what I stated in my dissent in *State, ex rel. Heller,* v. *Miller* (1980), 61 Ohio St. 2d 6, 15, a case in which the majority of this court mandated appointed counsel and transcripts at state expense in a civil proceeding involving parental rights, as follows:

"Where will the right to have appointed counsel and transcripts at state expense end? Indigent citizens may claim that many other activities or elements of their lives are based upon a constitutionally protected civil right, and seek appointed counsel in a legal proceeding, whether the nature of such proceeding be within the realm of contract, negligence or property law."

This court now proceeds from mandated appointed counsel and transcripts at state expense in civil cases involving parental rights to state prepaid blood grouping tests in paternity actions. May it be assumed that our county welfare departments or the state welfare department has budgeted for these unexpected added expenses? I think not. I ask again, where will these claims based upon alleged deprivation of due process and equal protection rights end?

Parenthetically, it should be noted that in my view the majority opinion has concluded upon an unconstitutional note in holding that the law as pronounced was only applicable in ADC paternity cases, and inapplicable in paternity proceedings in which the state was not to be the recipient of any funds recovered from the defendant. This differentiation is highly questionable in that it establishes unequal standards reasonably subject to equal protection claims.

Based on the foregoing, I would affirm.

KRUPANSKY, J., concurs in the foregoing dissenting opinion.