Russell B. KENNEDY, III, Appellant
(Respondent below),

v.

Rita WOOD, Appellee (Petitioner below).

No. 4–382A51.

Court of Appeals of Indiana,
Fourth District.

Sept. 29, 1982.
Rehearing Denied Oct. 28, 1982.

Stephen J. Moore, Chris Sautter, Legal Services Organization of Indiana, Inc., Bloomington, for appellant.

Frank I. Hamilton, Jr., Deputy Pros. Atty., Decatur County, Greensburg, Linley E. Pearson, Atty. Gen., Richard Albert Alford, Deputy Atty. Gen., Indianapolis, for appellee.

YOUNG, Presiding Judge.

Russell Kennedy appeals a paternity judgment entered against him. He contends that he was indigent and, as such, was entitled to both court appointed counsel and a blood grouping test at State expense as rights provided by the Indiana Code and guaranteed by the United States Constitution.

We reverse.

After complainant Wood began receiving welfare benefits, she, represented by the deputy prosecuting attorney, commenced an action to have Kennedy adjudicated the father of her child born out of wedlock. The petition and notice of hearing, set for August 31, 1979, were sent to Kennedy on June 18, 1979. Kennedy apparently did not answer the petition. Thereafter, Kennedy was informed that a final hearing was set

for August 31, 1979. Wood stopped receiving welfare benefits[1] and did not pursue the matter to a final hearing at this time. Two years later, Wood began receiving welfare assistance again. On August 21, 1981, notice was sent to Kennedy that a final hearing would be held on October 2, 1981. Kennedy appeared at this hearing without counsel. Wood appeared in person and by counsel, the local deputy prosecutor. The court questioned Kennedy concerning his efforts to retain an attorney. After discovering that the cause had been filed for over two years, the court, without further consideration, indicated that Kennedy had had enough time to get an attorney and that the trial would immediately commence. Kennedy did not indicate he was indigent at this time, and the court did not inquire into his financial situation or appoint counsel for him.[2] The trial began when complainant Wood testified implicating Kennedy as the father. Kennedy testified indicating that he had been unemployed for several months and had no income of any kind. He further suggested that Wood was the reason behind the two year delay in that she had failed to appear on the prior hearing date. Kennedy contested his paternity by testifying that Wood had been with several other men during the time in question. Because she had been out with other men, he requested a blood test.[3] The trial court then asked Wood if any of Kennedy's statements were true. She responded "no" and the court entered judgment in her favor without further consideration.

1.  Wood was apparently living out of state.

2.  This procedural situation is similar to that found in *Lassiter v. Dep't of Social Services,* (1981) 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640. In *Lassiter,* the petitioner was brought from prison to the hearing, and the court, after determining *sua sponte* that she had been given ample opportunity to obtain counsel and that her failure to do so was without just cause, did not postpone the proceedings. Petitioner did not aver that she was indigent, and the court did not appoint counsel for her.

3.  After trial, he also filed a written *pro se* motion requesting a blood test.

4.  The services of the prosecuting attorney are voluntarily provided to all custodial parents but are *mandatory* where the custodial parent is

This court must decide whether under these circumstances due process required the appointment of counsel at State expense to represent Kennedy. Additionally, we must determine whether the blood grouping tests requested by him should have been provided at State expense.

Kennedy argues that because the State's involvement in this paternity action is significant and substantial he has a constitutional due process right to appointed counsel as an indigent. The State's involvement is a result of the enactment by the legislature of Ind.Codes 12–1–6.1–1 to –20, implementing Title IV–D of the federal Social Security Act. 42 U.S.C. §§ 651–60 (1976). This Act requires states to establish or designate an agency to obtain and enforce orders for support of children for whom application to Aid to Families with Dependent Children has been made, and when necessary, to establish paternity to reduce the number of recipients. Under the statutory scheme, the designated agency, State Department of Public Welfare, contracts with prosecuting attorneys in each county to bring paternity actions under the authority of Ind.Code 31–6–6.1–2(b) (Supp.1980).[4]

Because Wood's child was a recipient of this public assistance, she was required under Indiana law to name the putative father and to cooperate with the welfare department in establishing paternity or risk the loss of her assistance.[5] Ind.Code 12–1–

receiving welfare payments. This places paternity defendants at a distinct disadvantage when compared with the ordinary civil litigant. These actions are pursued by the prosecutor and supported by the resources and power of this State. The prosecutor's expertise in these matters aided by staff and material pits the State, not an ordinary advocate, against the defendant.

5.  Both the federal and state regulations detail the degree of cooperation and include:
    (1) assigning support to the state;
    (2) providing information to establish paternity; and
    (3) appearing as a witness.
    The application form requires the applicant to read a statement which includes:
    "I agree to cooperate in getting the absent parent to pay support for the child(ren) for

7–1.1; 470 I.A.C. 10–2–4. Thus, the prose-cuting attorney filed the paternity action in Wood's name and the State agency became the recipient of the monthly support payments to be made once judgment was entered. Ind.Code 12–1–7–1.1 *et seq.* In addition, enforcement of this judgment has been made mandatory upon the State by federal regulations. 45 C.F.R. § 303.6. "State action" obviously pervades this case; therefore, the constitutional obligation is considered within this context rather than the context of civil litigation between private parties.

The Fourteenth Amendment to the United States Constitution requires that no person shall be deprived of life, liberty, or property without due process of law. Due process, however, has never been, and perhaps never can be, precisely defined. *Lassiter v. Department of Social Services,* (1981) 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640. The phrase expresses the requirement of "fundamental fairness." *Id.* To meet due process requirements, appointed counsel has been required in certain circumstances, regardless of whether the action is labelled criminal or civil. *In re Gault,* (1967) 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (juvenile delinquency determination); *Specht v. Patterson,* (1967) 386 U.S. 605, 608, 610, 87 S.Ct. 1209, 1211, 1212, 18 L.Ed.2d 326 (sentencing post conviction); *F. J. v. State,*

(1980) Ind.App., 411 N.E.2d 372 (mental commitment proceedings).[6]

▪ Whether due process requires appointment of counsel, however, depends upon the nature of the proceedings and the interests involved. There is a presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty. *Lassiter, supra.* Against this presumption, the other elements in the due process decision must be measured. The factors to be evaluated in deciding what due process requires are: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Id.* (citing *Mathews v. Eldridge,* (1976) 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18). If these factors when weighed against the presumption, suffice to rebut that presumption, due process requires the appointment of counsel. *Lassiter, supra.*

In Indiana a paternity action is civil in nature. *D. R. S. v. R. S. H.,* (1980) Ind. App., 412 N.E.2d 1257. However, as noted above, the "civil" label does not dictate that the appointment of counsel should be denied. Because no direct deprivation of liberty is involved we must consider the *Eldridge* factors and weigh them against the presumption before making any determination.

whom application is made. I understand that failure to cooperate without establishing good cause shall result in termination of financial assistance and medicaid for myself." *See* 45 C.F.R. § 232.12 and 470 I.A.C. 10–2–4.

**6.** We note parenthetically that our legislature has recognized the importance of counsel by providing for appointed counsel in juvenile delinquency proceedings, Ind.Code 31–6–7–2(a), and for appointed counsel, when necessary, in proceedings to terminate parental rights. Ind. Code 31–6–7–2(b). In addition, Ind.Code 34–1–1–3 provides:

Any person not having sufficient means to prosecute or defend an action may apply to the court ... for leave to prosecute or defend, as a poor person. The court, if satisfied that such person has not sufficient means to prosecute or defend the action ... shall assign him an attorney ... who shall do (his) duty therein without taking any fee or reward therefor from such poor person.

The direction of this statute and its purpose have been clearly stated by Justice DeBruler in *Thompson v. Thompson,* (1972) 259 Ind. 266, 286 N.E.2d 657:

From the date of its admission to the Union down to this day, Indiana has been a leader in providing indigent persons with free access to her courts and in providing them with fair treatment while in court. This just policy has found expression in § 49–1305b, and in such statutes as § 2–211. (now I.C. 34–1–1–3).... Both Burns § 49–1305b and Burns § 2–211, are intended to exempt a class of persons from paying court costs and other necessary expenses of litigation, which they are unable to pay because of their poverty. *It is the stated purpose of these statutes and the obvious intent of our Legislature to permit indigent persons free access to our courts and the legal remedies they afford.* Hendryx v. State (1892), 130 Ind. 265, 29 N.E. 1131; *Hoey v. McCarthy* (1980), 124 Ind. 464, 24 N.E. 1038.... [Emphasis ours.]

The private interests implicated here are substantial. *See Little v. Streater,* (1981) 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627. The paternity defendant has a direct financial interest because, as an adjudicated father, he may be obligated to provide support and education for the child which may extend beyond the child's majority. Garnishment of wages can follow a failure to pay support. The debt is not dischargeable in bankruptcy even if the support is assigned to the State. 42 U.S.C. § 656(b). Additionally, it is enforceable against moneys held by the federal government. 42 U.S.C. § 659. The support order is enforceable in other states through interstate assistance statutes. 42 U.S.C. §§ 651–55. *See Reynolds v. Kimmons,* (1977) Alaska, 569 P.2d 799, at 802 (discussing significant effects of this type of litigation). Similarly, the adjudicated father's estate can be burdened by the child's claims to inheritance, worker's compensation benefits and insurance proceeds. *See e.g., Mathews v. Lucas,* (1976) 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651; *Weber v. Aetna Cas. & Sur. Co.,* (1972) 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768; *Tekulve v. Turner,* (1979) Ind. App., 391 N.E.2d 673.

The paternity defendant has a substantial interest in the accuracy of the adjudication for other reasons. Although a paternity proceeding is not likely to result in immediate incarceration, a parent of a dependent child who intentionally fails to provide support when he is able to provide support may be held criminally liable. Ind.Code 35–46–1–5. At trial in such a charge, evidence introduced and admissions made without counsel in the paternity proceeding could play a significant role.[7] *See Reynolds, supra.* Moreover, the support order may result in contempt proceedings, *Richardson v. Lake County Department of Welfare,* 439 N.E.2d 722, 1982, Ind.App., and the paternity judgment is *res judicata* in subsequent civil proceedings. *Basey v. Estate of Sowers,* (1972) 154 Ind.App. 537, 290 N.E.2d 488.

Apart from the putative father's pecuniary interest in avoiding substantial support and his liberty interest threatened by possible sanctions for non-compliance, at issue is the creation of a basic human relationship of parent and child. In *Little, supra,* our United States Supreme Court discussed the significance of this relationship:

This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. See *Stanley v. Illinois,* 405 U.S. 645, 651–652, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972). Just as the termination of such bonds demands procedural fairness, see *Lassiter v. Department of Social Services,* [452] U.S. [18], 101 S.Ct. 2153 [68] L.Ed.2d [640] (1981), so too does their imposition. Through the judicial process, the State properly endeavors to identify the father of a child born out of wedlock and to make him responsible for the child's maintenance. Obviously, both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination.

*See also Reynolds, supra* at 802.

As the *Little* court noted the private interests of the child in an accurate determination are also compelling. The child's rights of support, inheritance, and custody are directly affected by the proceeding. The child's health interests are affected as an accurate family medical history can be critical in the diagnosis and treatment of a child's injuries and illnesses. *Wake County v. Townes,* (1981) 53 N.C.App. 649, 281 S.E.2d 765. The adjudicated father may assert rights to custody and must give consent before the child can be adopted. Moreover, a parent's furnishing of support in the form of necessary food, shelter, clothing, medical attention and education to a child until the age of sixteen, gives a parent a cause of action against the child by the parent for the parent's own support which is enforceable by execution and contempt. Ind.Code 31–2–9–1 *et seq.* A child can also

---

**7.** Kennedy's testimony, in response to Wood's testimony, that "we had sex more than any two times a week" is a sound example of the need for advice of counsel.

be held criminally liable for nonsupport of a parent. Ind.Code 35–46–1–7. Thus, the child's interest in an accurate determination of paternity at least equals that of the putative father. The creation of a parent-child relationship carries with it numerous rights and obligations for both the child and the father.

On the other hand, the State's interest in an accurate determination is different. Its motivation to insist that the paternity decision be made with care and precision is somewhat less than the other parties since its interest is primarily financial. *See Hepfel v. Bashaw,* (1979) Minn., 279 N.W.2d 342. Because the mother assigns her rights to financial support from the father to the welfare department, the department, not the child or mother, can potentially become the predominant party in interest. The State then emphasizes its concern to find any man it can hold financially liable to reimburse it and, as the case here, without the aid of blood tests, urges the acceptance of the uncorroborated testimony of the mother as sufficient proof of paternity.[8] The State also wants the determination to be made as economically as possible and thus wants to avoid the expense of appointed counsel and the cost of the lengthened proceedings his presence may cause. *See Lassiter, supra* 101 S.Ct. at 2160. While these pecuniary interests are legitimate, they are hardly significant enough to overcome the compelling private interests of the putative father and child.[9]

Finally, we must consider the risk that the procedure used will lead to erroneous results. The legislature has recognized the complexity of these proceedings and the importance of their outcome to the State and has afforded the mother and child the assistance of counsel in prosecuting their claim. However, by intervening heavily on behalf of one side, the State has upset the balance of a traditionally private dispute.[10] The chances that the significant consequences of fatherhood will be imposed on the incorrect man dramatically increase if, because he is unable to afford counsel, he offers a legally inept or no defense. *Salas v. Cortez,* (1979) 24 Cal.3d 22, 154 Cal.Rptr. 529, 593 P.2d 226, cert. denied, 444 U.S. 900, 100 S.Ct. 209, 62 L.Ed.2d 136.

The fact-sensitive nature of the paternity proceedings and the importance of blood tests further demonstrate the necessity for the timely assistance of counsel to ensure that the putative father is apprised of his right to request blood tests and to inform him of their significance.[11] The value of blood tests in exonerating innocent putative fathers has been recognized.[12] *Little, supra,* 101 S.Ct. at 2206. Indeed, this scientific evidence is very important because "[t]here are seldom accurate or reliable eye witnesses since the sexual activities usually take place in intimate and private surroundings, and the self-serving testimony of a party is of questionable reliability.[13] *Id.*

8. The State suggested at oral argument that it seldom requested blood tests because it was expensive and would not necessarily assist their cause.

9. Pursuant to 42 U.S.C. § 655(a)(1) the states are entitled to reimbursement of 75% of the funds they expend on their approved child support plans. Regulations promulgated under authority of 42 U.S.C. § 1302 make clear that such federal financial participation is available for the development of evidence regarding paternity, "including the use of blood tests." 45 C.F.R. § 304.20(b)(2)(i)(B) (1980).

10. Prior to implementation of Title IV–D of the Social Security Act, the determination of paternity may have been a relatively private affair between the mother, child, and putative father.

11. However, see n. 8.

12. A joint report of the American Medical Association and the American Bar Association recommends a series of seven tests which provide a greater than 90% cumulative probability of negating paternity for erroneously accused men. *See Little, supra.* Use of the HLA tissue typing system alone provides a 78 percent probability of exclusion of an innocent father. (Joint AMA–ABA Guidelines: *The Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247, 257–258 (1976)).

13. There are many reasons why the man named by a mother as the father of her child may not necessarily be the father. She may simply not know which of several possible men is in fact the father. Additionally, she may wish to protect the actual father or protect herself from retribution from him. (*See gener-*

(quoting Larson, *Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond*, 13 J. Family L. 713 (1974)). Professor Harry D. Krause's study suggested the tremendous potential for erroneous adjudications of paternity. Krause's research revealed that it is not uncommon for 95% of the paternity disputes to result in findings of parentage. *Wake County, supra* 281 S.E.2d at 771 (discussing H. Krause, Illegitimacy; Law and Social Policy 149–51 (1971)). Yet, in a study based on 1000 cases, 39.6% of the accused men were conclusively shown by blood tests not to be the fathers. Of equal significance is another study in which 18% of a group of accused men who acknowledged paternity were proven by blood tests not to be the fathers of the children they acknowledged. *Id.*

Moreover, in *Little, supra,* an indigent defendant who faced the State in a paternity suit was found to have, upon demand, a constitutional right to a free blood grouping test. The Court stated "... access to blood grouping tests for indigent defendants ... would help to insure [sic] the correctness of paternity decision." 452 U.S. at 14, 101 S.Ct. at 2209, 68 L.Ed.2d at 637. An indigent defendant's right to a free blood grouping test may be rendered meaningless without counsel to advise him of the right to demand such a test, to explain its significance, to ensure that the test is properly administered and to ensure that the results are properly admitted into evidence. *Wake County, supra.* Thus, the risk of an erroneous adjudication of parentage is great in a paternity suit when the indigent defendant has no counsel to advise him of his right to a blood group test, to conduct vigorous cross-examination of the State's key witness and to assist the defendant through the paternity hearing, *Wake County, supra.*[14]

As we noted earlier, in quoting an excerpt from *Little, supra,* this case, being prosecuted by the State with all its resources and power, is similar in importance to the termination of parental rights case.[15] In Indiana, the legislature has provided appointed counsel to parents in termination hearings as well as the right to be advised that counsel will be appointed if necessary. See Ind.Code 31–6–7–2(b) and 31–6–5–3. Certainly the same considerations, the nature of the right in question and the relative power of the antagonists, are as applicable and as important in the creation of the parent-child relationship as they are in the parental rights termination case. We find no compelling State interest to justify a denial of the same fair opportunity to be heard by the indigent paternity defendant. The private interests and the likelihood of erroneous results in the current procedures used outweigh the State's financial interest and are sufficient to overcome the presumption earlier noted.

■ In view of the fact that this paternity suit, in effect, was brought by the State, the significance of the parent-child relationship, and the particular problems presented, we hold that due process and fundamental fairness demand that counsel be appointed in these paternity suits instituted under the federal acts and statutes discussed. Because this right would be

---

*ally* Poulin, *Illegitimacy and Family Privacy,* (1976) 70 Nw.U.L.Rev. 910, 923–924 (1976)). Since cooperation with the district attorney is mandatory for women receiving AFDC, a mother may also simply supply a name in order to avoid termination of welfare benefits. Gliaudys, [Paternity: A Reluctant Fatherhood], *supra,* 53 State Bar at 322. Further, studies have shown that much testimony regarding the parties' sexual contacts in paternity suits is unreliable. (*See* H. Krause, Illegitimacy: Law and Social Policy pp. 107–108 (1979)). *Wake County, supra* at 771 (*quoting Salas v. Cortez,* (1979) 24 Cal.3d at 31, n. 7, 154 Cal.Rptr. 529, n. 7, 593 P.2d at 233, n. 7.

14. The complexities of a jury trial may create another barrier to the indigent defendant's "meaningful opportunity to be heard" in view of the State's financial resources and expertise.

15. The *Little* Court described the defendant's interest in the accurate outcome of the paternity suit as "a compelling interest" and equated the situation to a parental status termination proceeding. *Little, supra* at 13, 101 S.Ct. at 2209, 68 L.Ed.2d at 636.

meaningless if such a defendant did not know of the right, we further hold that the court must advise the paternity defendant in this situation of his right to appointed counsel if he is indigent. *See Berzins v. Review Board of the Indiana Employment Security Division,* 439 N.E.2d 1121, Ind. 1982.

Because of our decision to reverse this judgment on the right to counsel issue, we need not discuss the alleged error in refusing to grant a continuance [16] to Kennedy for blood tests.[17] However, the question concerning the State's duty to provide blood grouping tests to indigent paternity defendants is likely to recur at trial, therefore, we address the merits of this issue.

In *Little, supra,* the United States Supreme Court discussed a constitutional challenge to Connecticut's paternity procedures which denied blood grouping tests to indigent paternity defendants even though they faced the State as an adversary because the mother received public assistance. The court held that "in these specific circumstances . . . to deny appellant blood grouping tests because of his lack of financial resources violated the due process guarantee of the Fourteenth Amendment." *Id.* 452 U.S. at 17, 101 S.Ct. at 2211, 68 L.Ed.2d at 639. We believe the Indiana procedures relating to blood grouping tests in paternity actions are sufficiently similar to Connecticut's procedures to make *Little, supra,* applicable.

Blood grouping tests in Indiana provide no less accurate and probative evidentiary value than blood tests performed in Connecticut. The State involvement in the present case is as pervasive as the involvement in *Little.* Indiana's statute, while not phrased in the same "quasi-criminal terminology" still has some indirect criminal undertones. The one distinguishing factor is the conclusive presumption of paternity established by statute.[18] With these things in mind, we turn to the *Mathews v. Eldridge,* (1976) 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, analysis.

In considering the *Mathews v. Eldridge* factors, we find the private interests are substantially similar to those found in *Little.*[19] The putative father has his pecuniary interest and an indirect liberty interest. The creation of a parent-child relationship is no less compelling than that found in *Little.* In addition, the factors discussed concerning the risk of erroneous deprivation and the probative value of the proposed additional procedure are equally applicable. Although the court acknowledged Connecticut's one-sided evidentiary rule, the most important factor bearing on its risk of an erroneous deprivation determination was the near irrefutability of blood grouping test results. *See, Anderson v. Jacobs,* (1981) 68 Ohio St.2d 67, 428 N.E.2d 419. Finally the *Little* court found that the State's monetary interest was "hardly significant enough to overcome the private interests as important as those here." *Little, supra* 452 U.S. at 16, 101 S.Ct. at 2209, 68 L.Ed.2d at 638.

■ The Ohio Supreme Court recently applied the *Little* case to the Ohio paternity procedures which are similar to those found in Indiana. *Anderson v. Jacobs, supra.* That court did not find the Connecticut evidentiary rule a sufficient basis to distinguish the *Little* case from their procedures. Neither do we. As the Ohio court noted:

---

**16.** At oral argument the State conceded that a request for continuance was inherently within the request for blood tests.

**17.** Ind.Code 31–6–6.1–8 provides:

Upon the motion of any party, the court *shall* order all of the parties to the action to undergo either a blood grouping test or a Human Leukocyte Antigen (HLA) tissue test. The tests shall be performed by a qualified expert approved by the court, and the results of the tests may be received in evidence.

**18.** Under Conn.Gen.Stat. Section 46b–160 (1981) if the complainant mother "continues constant in her accusation, it shall be evidence that the respondent is the father of such child." The courts have concluded that this statute places upon the alleged father the burden of showing his innocence by other evidence than his own. *Mosher v. Bennett,* (1929) 108 Conn. 671, 144 A. 297.

**19.** These factors were also discussed earlier in the first issue of this opinion.

The various factors considered by the Supreme Court in *Little* were treated cumulatively, but the court placed special emphasis on these three: (1) the importance of the parent-child relationship, (2) the unquestioned exculpatory value of blood grouping tests, and (3) the pervasiveness of the state's involvement in the proceedings.

*Anderson v. Jacobs, supra* 68 Ohio St.2d at 75, 428 N.E.2d at 425. We believe our present case comes within the scope of *Little*; therefore, we hold that the denial of blood grouping tests to an indigent paternity defendant, who is unable to prepay for the tests and who faces the State as an adversary when the complainant is a recipient of public assistance, violates the due process guarantee. The blood grouping test shall be provided to a defendant upon a proper request and a demonstration of indigency.

The judgment is reversed and the cause remanded for proceedings consistent with this opinion.

MILLER and CONOVER, JJ., concur.