STATE OF TENNESSEE,       )
DEPARTMENT OF HUMAN SERVICES,    )
ASSIGNEE OF: JUDY STANLEY,       )
                                  )
        Plaintiff/Appellee,         )        Appeal No.
                                    )        01-A-01-9605-CV-00231
v.                              )
                                  )        Dickson Circuit
JOHN FRANKLIN HOOPER,        )        No.    8015
                                  )
        Defendant/Appellant.    )

**FILED**

**February 28, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE CIRCUIT COURT FOR DICKSON COUNTY

AT CHARLOTTE, TENNESSEE

THE HONORABLE ROBERT E. BURCH, JUDGE

CHARLES W. BURSON
Attorney General & Reporter

KIMBERLY M. FRAYN
JENNIFER HELTON SMALL
404 James Robertson Parkway Suite 1501
Nashville, Tennessee 37243-0499
       ATTORNEYS FOR PLAINTIFF/APPELLEE

BRIAN K. FRAZIER
Neal & Harwell
2000 First Union Tower
Nashville, Tennessee 37219-2498
       ATTORNEY FOR DEFENDANT/APPELLANT

REVERSED AND REMANDED

SAMUEL L. LEWIS, JUDGE

# OPINION

This appeal involves the application and constitutionality of Tennessee's law creating a conclusive presumption of paternity when a DNA test shows the statistical probability of paternity is ninety-nine percent (99%) or greater. The Dickson County Circuit Court held that Tennessee Code Annotated section 24-7-112(b)(2)(B) is constitutional. Since there was no dispute as to any material fact, the court held that the State was entitled to summary judgment establishing the defendant's paternity as a matter of law. In addition, the court ordered the defendant to make weekly payments for the care and maintenance of the child as well as for back child support dating from the time of the child's birth. We find that the conclusive presumption of section 24-7-112(b)(2)(B) violates the Due Process Clause of the Fourteenth Amendment and, therefore, we reverse the decision of the trial court.

On 20 September 1990, the State of Tennessee, as assignee for Judy Stanley, filed a suit to obtain a judgment of paternity and support payments against Defendant John Franklin Hooper for Anthony Bryan Stanley, a minor child born out of wedlock in April of 1990. The evidence shows that Ms. Stanley and Defendant met in 1986 and cohabitated intermittently for the next five years during which time Ms. Stanley was married for three months to another man in 1987. In November of 1988, Ms. Stanley and Defendant had a child who was born premature and survived only six days. As stated, Ms. Stanley had another child in 1990, Anthony Bryan Stanley. Ms. Stanley's deposition testimony was that she was certain that Defendant was the father of this child. She stated that she was living with Defendant and in an exclusive sexual relationship with him at the time of this child's conception. A DNA paternity test established a 99.71% "probability of paternity."

Though Defendant denied ever staying overnight with Ms. Stanley, he did admit having sexual relations with her. The record contains certain letters written to Defendant by Ms. Stanley communicating that he was not the father of this child. However, Ms. Stanley testified that she wrote these under threats to her life from Defendant's mother. Also, as indicated by a responsive letter to Ms. Stanley from the district attorney's office, Ms. Stanley requested that the paternity suit, once underway,

be dropped. In this letter, the district attorney advised her against this declaring that he would not dismiss the case until he had an opportunity to discuss it in its entirety with Ms. Stanley. As is obvious, the case was never dismissed.

I.

In his first issue, Defendant asserts that Tennessee Code Annotated section 24-7-112(b)(2)(B) is applicable only to alleged fathers who have voluntarily acknowledged paternity. Section 24-7-112, in which the specific statute at issue is found, is entitled as follows: "Tests to determine parentage - Admissibility in evidence - Costs." It provides, in pertinent part, that "[i]n the trial of any civil or criminal proceeding in which the question of parentage arises, the court before whom the matter may be brought . . . shall order that all necessary parties submit to any tests and comparisons which have been developed and adapted for purposes of establishing or disproving parentage [including] any blood, genetic, or DNA test utilized by an accredited laboratory." Tenn. Code Ann. § 24-7-112(a)(1) (Supp. 1996). Further, "[t]he results of such tests and comparisons, including the statistical likelihood of the alleged parent's parentage, if available, may be admitted into evidence as provided in subsection (b)." *Id.* The relevant portion of subsection (b), the specific statute at issue in this case, is as follows:

> (B) An individual is conclusively presumed to be the father of a child if blood, genetic, or DNA tests show that the statistical probability of paternity is ninety-nine percent (99%) or greater. A rebuttable presumption of the paternity of an individual is established by blood, genetic, or DNA testing showing a statistical probability of paternity of that individual at ninety-five percent (95%) or greater.

*Id.* § 24-7-112(b)(2)(B) (Supp. 1996).

In support of his contention that the conclusive presumption of section 24-7-112(b)(2)(B) requires a voluntary acknowledgment, Defendant points out that this provision was passed as part of a larger bill, House Bill No. 2527, the bulk of which sets forth the relationship between voluntary acknowledgments of paternity, paternity tests, and rebuttable or conclusive presumptions. House Bill 2527 included provisions amending the code section entitled "[v]oluntary acknowledgment of

paternity" which provides that a voluntary acknowledgment of paternity becomes conclusive after a DNA paternity test result of 99% or greater. *See id.* § 24-7-118(d)(3). Thus, it is Defendant's argument that, read in context of the entire applicable law, the conclusive presumption in section 24-7-112(b)(2)(B) is conditioned upon and can be applied only in cases in which a defendant has voluntarily acknowledged paternity.

Defendant proffers as another piece of textual evidence for his interpretation of the statute the overlap in section 24-7-112(b)(2)(B) between the "ninety-five percent (95%) or greater" and the "ninety-nine percent (99%) or greater" figures. This provision is worded so that there is potentially both a conclusive and a rebuttable presumption between the 99% and 100%. In other words, the language of the statute does not indicate that the rebuttable presumption ends at 98%. Thus, according to Defendant, the more logical interpretation is that, for test results between 99% and 100%, the rebuttable presumption attaches if there is no voluntary acknowledgment and the conclusive presumption attaches only if there is such an admission. Finally, Defendant points out that section 36-2-104(d)(dealing with payment of child support into an escrow account pending adjudication on the issue of paternity) contemplates a jury trial in cases in which a defendant has a paternity result of 95% or more which includes results of 99% or more. That statute provides that "[i]f the defendant requests a jury trial on the issue of paternity after blood tests have been obtained which indicate a presumption of paternity greater than ninety-five percent (95%), the court may, in its discretion, in lieu of an indemnity bond, order a defendant to pay child support to the clerk of the court to be held in escrow pending final adjudication." *Id.* § 36-2-104(d)(1996).

"Our role in construing statutes is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn. 1994)(citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). Where a statute is unambiguous, this court must ascertain and give effect to the intention and purpose of the General Assembly as expressed in the four corners of the statute. *Gabel v. Lerma*, 812 S.W.2d 580, 582 (Tenn. App. 1990)(citing *Memphis Pub'g Co. V. Holt,* 710 S.W.2d 513 (Tenn. 1986)). An early expression of the "four corners" rule, which is the most

basic and fundamental rule of statutory construction, was recently quoted by our Supreme Court:

> [I]f [the legislative intent] is expressed in a manner devoid of contradiction and ambiguity, there is no room for interpretation or construction, and the judges are not at liberty, on consideration of policy or hardship, to depart from the words of the statute; that they have no right to make exceptions or insert qualifications, however abstract justice or the justice of a particular case may require it.

*Carson Creek Vacation Resorts, Inc. v. State Dep't of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993)(quoting *Austin v. Memphis Publ'g Co.*, 655 S.W.2d 146, 148 (Tenn. 1983)(quoting *Heiskell v. Lowe*, 153 S.W. 284, 290 (Tenn. 1912)).

In *Austin v. Memphis Publ'g Co.*, at issue was the interpretation of a statute which "stated that a newsman, etc., gathering information for publication, shall not be required to disclose to any Tennessee court, etc., 'any information or the source of any information procured for the publication or broadcast.'" *Austin*, 655 S.W.2d at 148 (quoting Tenn. Code Ann. § 24-1-208 (1973)). The Court of Appeals had interpreted the statute by inserting the word "confidential" before "information" because it was "evident to [them] that the statute was passed to assure confidentiality in order to facilitate the gathering of news and information, which confidentiality was not provided by [a certain United States Supreme Court] decision." *Austin,* 655 S.W.2d at 147. Reversing the lower court's decision, the Tennessee Supreme Court held that the "four corners" rule "prohibit[ed] the courts from resorting to outside sources to determine legislative intent." *Id.* at 149.

In this case, the language of Tennessee Code Annotated section 24-7-112(b)(2)(B) very clearly creates a conclusive presumption of paternity based upon DNA test results alone. It is true, as Defendant asserts, that elsewhere in the code, a voluntary acknowledgment of paternity followed by a DNA test result showing a probability of paternity of 99% or greater causes the voluntary acknowledgment to become conclusive. *See* Tenn. Code Ann. § 24-7-118. However, the legislature did not condition the conclusive presumption of section 24-7-112 upon a voluntary acknowledgment of paternity, and as was the court in *Austin*, we are prohibited from inserting any such requirement into the statute. *See Tennessee Manufactured Hous.*

*Ass'n v. Metropolitan Gov't of Nashville*, 798 S.W.2d 254, 257 (Tenn. App. 1990)(citations omitted)(courts "should presume that the General Assembly chose its words carefully.")

II.

Having ruled that Tennessee Code Annotated section 24-7-112(b)(2)(B) was properly applied to this defendant, we turn to Defendant's constitutional challenge. In this case, Defendant asserts that section 24-7-112(b)(2)(B), by imposing a conclusive presumption of paternity in cases where the DNA tests show a statistical probability of 99% or greater, operates to deny putative fathers the due process of law violating the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 8 of the Tennessee Constitution. The Fourteenth Amendment provides in part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Our supreme court has consistently held that Article 1, Section 8 of the Tennessee Constitution confers the same protections as does the Fourteenth Amendment. *Brown v. Campbell County Bd. Of Educ.*, 915 S.W.2d 407, 413 (Tenn. 1995), *cert. denied*, 116 S. Ct. 1852 (1996); *State v. Tester*, 879 S.W.2d 823, 827 (Tenn. 1994).

"[P]ermanent irrebuttable presumptions have long been disfavored under the Due Process Clause." *Cleveland Bd. Of Educ. V. LaFleur*, 414 U.S. 632, 644 (1974)(citing *Vlandis v. Kline*, 412 U.S. 441, 446 (1973)). In *Vlandis*, the Court held violative of due process a Connecticut statute which created a conclusive presumption of non-residency for students who had non-Connecticut addresses at the time of applying for admission to a Connecticut school and who were later attempting to qualify as residents for purposes of reduced tuition rates. The Court stated that "it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact." *Vlandis,* 412 U.S. at 452; *see also Stanley v. Illinois*, 405 U.S. 645 (1972)(holding that an Illinois statute containing an irrebuttable presumption that unmarried fathers are incompetent to raise their children violated the Due Process Clause.)

-6-

In an early example of its dissatisfaction with the use of conclusive evidence, the Tennessee legislature amended a 1741 statute involving the establishment of paternity. The statute provided that "the person charged by the woman before the justices was to be adjudged the reputed father, and nothing further was to be done when the proceedings were returned to the county court but for the court to make the order for maintenance." *Goddard v. State*, 10 Tenn. 96, 97 (1825). However, "[b]y the act of 1822, ch. 29, the legislature provide[d] that the affidavit of the woman shall not be conclusive upon the county court, and the reputed father cut off from all enquiry in every possible case; but upon filing his affidavit clearly setting forth that justice requires an issue to be made to try the truth of the charge, it shall be the duty of the court where such charge is pending to hear proof and determine the matter as to right and justice may appertain." *Id.* at 98; 1822 Tenn. Pub. Acts ch. 29, § 1.

Like the 1741 statute, the irrebuttable presumption of Tennessee Code Annotated section 24-7-112(b)(2)(B) effectively denies putative fathers the opportunity to be heard. The Supreme Court has held "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Little v. Streater*, 452 U.S. 1, 5-6 (1981)(citing *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971)). In determining what process is due in a particular situation, three factors must be considered: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *State v. Barnett,* 909 S.W.2d 423, 426 (Tenn. 1995).

In the case at bar, the private interests are substantial. *Little*, 452 U.S. at 13. In *Little*, the Court held that due process was violated when a statute, which provided that the cost of blood tests in paternity actions was to be borne by the party requesting the tests, operated to deny such tests to an indigent defendant. As in our situation, the

*Little* Court noted the pecuniary interest of the putative father in avoiding a substantial support obligation and the liberty interest threatened by potential sanctions for failure to comply with child support obligations. *Id.; see* Tenn. Code Ann. § 36-5-104(1996) (providing that the failure to comply with orders to support minor children may be punished by imprisonment in the county workhouse or county jail for up to six (6) months.) In addition, the Court in *Little* stressed the significance of the creation of the parent-child relationship. "Just as the termination of such bonds demands procedural fairness, so too does their imposition." *Little*, 452 U.S. at 13 (citation omitted). Further, the Court stated that "both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination." *Id.* An Indiana court which found that an indigent paternity defendant was entitled to both court-appointed counsel and free blood grouping tests further expounded upon the child's interests: "The child's rights of support, inheritance, and custody are directly affected by the proceedings. The child's health interests are affected as an accurate family medical history can be critical in the diagnosis and treatment of a child's injuries and illnesses. The adjudicated father may assert rights to custody and must give consent before a child can be adopted." *Kennedy v. Wood*, 439 N.E.2d 1367, 1370-71 (Ind. App. 1982).

Arrayed against these substantial private interests are the State's interests. The thrust of the State's interest, as articulated in its brief, is the "huge and unwarranted fiscal and administrative burden on the State and on mothers of children born out of lawful wedlock" which would result if the statute is held unconstitutional. Indeed, if the conclusive presumption is held unconstitutional, the rebuttable presumption for test results showing a 95% or greater probability of paternity will still stand, and defendants, including those whose test are above 99%, will be given the opportunity to rebut the presumption of their paternity if they so desire. There is no way to empirically determine how many more hearings on the issue of paternity there will be in the absence of the conclusive presumption. However, the Supreme Court has said that "[t]he State's interest in administrative ease and certainty cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised." *Vlandis*, 412 U.S. at 451. Here, another reasonable means is to give the putative father the

chance to rebut the presumption of paternity just as he would have had if his DNA test results had shown a 98.9% probability of paternity.

We agree that invalidating the conclusive presumption of section 24-7-112(b)(2)(B) will be more costly for the State of Tennessee. "Procedure by presumption is always cheaper and easier than individualized determination." *Stanley*, 405 U.S. at 656-57. Still, in *Little*, while the Court acknowledged the State's legitimate interest in children born out of wedlock and in the accurate and just determination of their paternity, it concluded that "the State's monetary interest 'is hardly significant enough to overcome private interests as important as those here.'" *Little*, 452 U.S. at 16 (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 28 (1981)).

The final consideration under *Mathews v. Eldridge* involves the risk of inaccurately adjudicating someone a father because the conclusive presumption has foreclosed his ability to demonstrate that he is not the father of a particular child. To understand this risk, it is essential to understand what the probability of paternity percentage actually means. With a 9.98% probability of paternity, which is significantly higher than Defendant's in this case, "in a city with a same-race male population of 500,000, or even 500,001, one hundred other men might theoretically be the father. Taking this to a global scale, if there are 500 million men of the same-race on the planet, 100,000 men might theoretically qualify as putative fathers." E. Donald Shapiro et al, *The DNA Paternity Test: Legislating the Future Paternity Action*, 7 J.L. & Health, 1, 44 (1992-93)(While this article is highly supportive of the use of DNA to determine paternity, it advocates a uniform paternity law where there is a conclusive presumption of paternity only in cases in which the probability of paternity is 99.9999% or above). Although we acknowledge that it is extremely likely that the man named in a paternity action with a 99% or greater probability of paternity is the true father, "the fact remains that paternity indexes are not mathematically solid." *Id.* In addition, there is the problem of human error in the scientific analyses of the DNA. *See* Edward J. Imwinkelried, *The Debate in the DNA Cases over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash U.L.Q. 19, 22 (1991)(indicating that there "is mounting evidence of a significant margin of error in scientific analysis . . . [and] that fifteen percent of all medical laboratory tests are in

error.") It is indisputable that an opportunity to be heard would be of value in guarding against an erroneous adjudication or paternity based upon a misleading or an inaccurate DNA test result.

Assessment of the factors found in *Mathews v. Eldridge* indicates that the conclusive presumption of Tennessee Code Annotated section 24-7-112(b)(2)(B) fails to provide men in paternity proceedings with the process that is constitutionally due. The State's interests pale when compared to the important private interests at stake in an adjudication of paternity. Furthermore, while the risk of an erroneous deprivation of these private interests is small, there is great value in providing an opportunity to rebut the evidence of paternity to a defendant who might not be the true father. We therefore find that, in order to have the "meaningful opportunity to be heard" guaranteed by the Due Process Clause, the conclusive presumption can not stand. We reverse the decision of the trial court and remand the case to the trial court so that this defendant may have an opportunity to rebut the presumption of paternity attached to a 99.71% probability of paternity. Costs shall be taxed against the State of Tennessee.

_____
SAMUEL L. LEWIS, JUDGE

CONCUR:

_____
HENRY F. TODD, P.J., M.S.

_____
WILLIAM C. KOCH, JR., J.