MARCIA LEE CARROLL, APPELLEE, V. EDWIN CHARLES MOORE, APPELLANT.

423 N.W.2d 757

Filed May 20, 1988.    No. 86-375.

Roberta S. Stick, for appellant.

Patrick M. Heng, Deputy Lancaster County Attorney, for appellee.

BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and BURKHARD, D.J.

BOSLAUGH, J.

This was an action by the plaintiff, Marcia Lee Carroll,

against the defendant, Edwin Charles Moore, to establish that the defendant was the father of the plaintiff's child born June 24, 1982. The plaintiff alleged that she had made application to the office of the county attorney for determination of paternity and support pursuant to Neb. Rev. Stat. § 43-512.02 (Reissue 1984).

The defendant's "answer" consisted of a letter enclosing a copy of a news article relating to two paternity suits then pending in this court.

Pursuant to a motion by the plaintiff, on July 5, 1985, the trial court ordered the plaintiff, the defendant, and the child to submit to blood tests. On the same day, the trial court wrote to the defendant, advising him that the court would appoint counsel for the defendant if he was indigent. On July 22, 1985, the defendant wrote to the court, stating that he would need appointed counsel.

At a hearing on August 19, 1985, the trial court advised the defendant that the court would not appoint counsel for him and that if the defendant wanted representation it was his responsibility to hire his own counsel. The court also advised the defendant that his "answer" would be treated as a general denial. The court allowed the defendant to use a blood test made in a previous case in lieu of a new test as ordered on July 5.

The case came on for trial on March 26, 1986, with the defendant appearing pro se.

The following report of the result of the test done on blood drawn from the defendant on July 9, 1985, and from the plaintiff and the child on July 23, 1985, was received in evidence without objection:

PATERNITY CASE REPORT

12-AUG-85

CHART NO. : 468791

CHILD : . . .                                                    SEX : . . .

DATE OF BIRTH : 6-24-82   PLACE OF BIRTH : ,

MOTHER : CARROLL MARCIA L   DATE OF BIRTH : 6-5-47

PUTATIVE FATHER : MOORE EDWIN C   DATE OF BIRTH : 8-9-50

## RESULTS

CHILD                    SAMPLE NO. 4380

| ABO | A1 | RH | R1R1 | MNS | NSNS | KELL | kk | Fy | bb |
|-----|-----|-----|------|-----|------|------|-----|-----|-----|
| Jk | aa | Lu | | P | | Di | | Gm | |
| Km | | ACP | BB | ESD | 11 | ADA | 11 | AK | 11 |
| GPT | 22 | GLO | 12 | PGD | AA | HAPT | 11 | PGM1 | 1+2+ |
| GC | 11 | BF | SS | PI | M1M3 | TNF | C1C2 | C3 | SF |

MOTHER                   SAMPLE NO. 4381

| ABO | O | RH | R1R1 | MNS | NSNs | KELL | kk | Fy | bb |
|-----|-----|-----|------|-----|------|------|-----|-----|-----|
| Jk | aa | Lu | | P | | Di | | Gm | |
| Km | | ACP | AB | ESD | 12 | ADA | 11 | AK | 11 |
| GPT | 22 | GLO | 22 | PGD | AA | HAPT | 11 | PGM1 | 1−2+ |
| GC | 11 | BF | SF | PI | M2M3 | TNF | C1C1 | C3 | SF |

PUTATIVE FATHER          SAMPLE NO. 4321

| ABO | A1 | RH | R1r | MNS | MNSs | KELL | kk | Fy | 0 |
|-----|-----|-----|------|-----|------|------|-----|-----|-----|
| Jk | aa | Lu | | P | | Di | | Gm | |
| Km | | ACP | BB | ESD | 11 | ADA | 11 | AK | 11 |
| GPT | 12 | GLO | 12 | PGD | AA | HAPT | 11 | PGM1 | 1+ |
| GC | 11 | BF | SF | PI | M1M1 | TNF | C1C2 | C3 | SS |

TYPE I EXCLUSIONS: NONE

TYPE II EXCLUSIONS: NONE

EXCLUSION RATE FOR CAUCASIANS    0.99901474

EXCLUSION RATE FOR BLACKS        0.99989253

EXCLUSION RATE FOR HISPANICS     0.99947333

PROBABILITY OF PATERNITY =       0.99991596

ODDS OF PATERNITY    11898. : 1

The letter accompanying the report stated that "99.99% of the male population has been excluded by this testing. Mr. Edwin Charles Moore has odds of 11,898 to one in favor of being the biological father of [the child]. This is a probability of paternity of 99.99%."

The trial court found that the defendant was the natural father of the child and fixed the child support at $75 per month commencing April 1, 1986, and increasing to $125 per month on June 1, 1986, and continuing until the child reaches the age

of 19, marries, dies, or becomes self-supporting, or until further order of the court.

The defendant has appealed and contends that the trial court erred in refusing to appoint counsel for the defendant and in ordering child support in the amount of $125 per month.

The principal issue is whether an indigent person who is alleged to be the father of a child is entitled to the appointment of counsel in a paternity proceeding. Nebraska has no statute providing for the appointment of counsel under those circumstances. The defendant contends that the due process clauses of the Constitutions of the United States and this state require that he be furnished counsel.

In *Little v. Streater*, 452 U.S. 1, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981), the mother of an illegitimate child who was a recipient of public assistance alleged that the defendant was the father of the child. The mother was provided with counsel by the state in order to initiate the paternity suit. The defendant's counsel was furnished by a legal aid group for the purpose of requesting that the trial court order blood grouping tests. A state statute then in effect provided that the costs of blood tests were chargeable to the moving party. The defendant asserted indigency and asked the state to subsidize the costs of the tests. The trial court denied the defendant's motion, and no tests were performed. The defendant was subsequently found to be the child's father and ordered to pay support. The appellate court affirmed the denial of the defendant's motion, finding that neither due process nor equal protection rights had been violated in denying the defendant's motion.

On certiorari to the U.S. Supreme Court, the defendant contended that his due process rights were violated when the state refused to pay for blood grouping tests requested by an indigent. The court, citing *Boddie v. Connecticut*, 401 U.S. 371, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971), stated that " 'due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a *meaningful opportunity to be heard.*' " (Emphasis supplied.) 452 U.S. at 5-6.

In determining whether or not an indigent paternity

defendant's opportunity to be heard would be rendered "meaningless" by the denial of blood testing at the state's expense, the Court noted that "[s]ince millions of men belong to the possible groups and types, a blood grouping test cannot conclusively establish paternity. However, it can demonstrate nonpaternity . . . . It is a negative rather than an affirmative test with the potential to scientifically exclude the paternity of a falsely accused putative father." 452 U.S. at 7. The Court recognized a 1976 joint report of the American Bar Association (ABA) and the American Medical Association (AMA) which confirmed the fact that blood grouping tests were available to exonerate innocent putative fathers. The ABA-AMA report recommended use of the "seven blood test 'systems'—ABO, Rh, MNSs, Kell, Duffy, Kidd, and HLA." 452 U.S. at 8. These systems were found to be " 'reasonable' in cost and to provide a 91% cumulative probability of negating paternity for erroneously accused Negro men and 93% for white men." *Id.* The Court, citing Justice Brennan in *Cortese v. Cortese*, 10 N.J. Super. 152, 76 A.2d 717 (1950), wrote:

"[I]n the field of contested paternity . . . the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity.

"The value of blood tests as a wholesome aid in the quest for truth in the administration of justice in these matters cannot be gainsaid in this day. Their reliability as an indicator of the truth has been fully established. The substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to disprove it, but 'they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts' . . . ."

452 U.S. at 8.

In deciding the process which was constitutionally due the defendant, the Court considered the three factors set out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976): (1) the private interests at stake; (2) the risk of erroneous results under current procedures, considered with the probable value of the suggested procedural safeguard; and (3) the governmental interests at stake.

The Court found that putative fathers' private interests in paternity proceedings were "substantial," 452 U.S. at 13, and included pecuniary interests (in avoiding support obligations), liberty interests (threatened by noncompliance with support orders), and interests relating generally to the creation of a parent-child relationship. "Just as the termination of such bonds demands procedural fairness, . . . so too does their imposition. . . . [B]oth the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination." *Little v. Streater*, 452 U.S. 1, 13, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981).

The Court's conclusion that erroneous results are possible without the aid of blood testing is reflected in the following passage:

> Given the usual absence of witnesses, the self-interest coloring the testimony of the litigants, and the State's onerous evidentiary rule and refusal to pay for blood grouping tests, the risk is not inconsiderable that an indigent defendant in a Connecticut paternity proceeding will be erroneously adjudged the father of the child in question. . . . Further, because of its recognized capacity to definitively exclude a high percentage of falsely accused putative fathers, the availability of scientific blood test evidence clearly would be a valuable procedural safeguard in such cases. . . . Unlike other evidence that may be susceptible to varying interpretation or disparagement, blood test results, if obtained under proper conditions by qualified experts, are difficult to refute. Thus, access to blood grouping tests for indigent defendants such as appellant would help to insure the correctness of paternity decisions in Connecticut.

(Citations omitted.) 452 U.S. at 14.

Finally, the governmental interests were found to be "legitimate" but " 'hardly significant enough to overcome private interests as important as those here.' " *Id*. at 16, citing *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

Following the analysis of the *Eldridge* factors, the Court held that the denial of the aid of a blood test to indigent defendants

in state-initiated paternity suits resulted in the denial of a " 'meaningful opportunity to be heard,' " and thus the due process requirement of fundamental fairness was violated. 452 U.S. at 16.

While *Little* did not address the issue of appointed counsel for indigent defendants in paternity suits, it demonstrated the magnitude of what is involved in a determination of paternity. One of the more important statements of the Court was the apparent approval of the ABA-AMA report. Thus, an indigent defendant on whom blood tests are to be performed is initially entitled to a group of tests known as the RCA tests, which include ABO, Rh, and MNS. If these tests do not *exclude* the defendant as the father, the Kell, Kidd, and Duffy systems, three additional RCA tests, should then be performed. If again paternity is not excluded, an HLA test should be conducted. It has been reported that the RCA tests (Rh, ABO, MNS, Kidd, Duffy, and Kell) will exclude no more than 65 to 70 percent of men who are not the biological father, but the HLA test *alone* will exclude over 90 percent of putative fathers. Roberts, *Establishing a Family: Blood Tests and the Paternity Determination Process*, 18 Clearinghouse Rev. 1290 (1985). The article stressed that

> [b]ecause of the quasi-criminal nature of most paternity proceedings and/or the potential res judicata effect of the judgment in subsequent criminal proceedings, these cases undoubtedly require that the HLA test as well as the RCAs be provided. To hold otherwise would allow those with adequate resources the opportunity to use tests guaranteed to exclude over 90 percent of the wrongly accused, while the indigent would have access to tests that exclude only 65 percent of the falsely named. This 25 percent or more disparity is of constitutional dimension.

*Id.* at 1295.

An additional study demonstrated that with use of the seven-system approach suggested by the ABA-AMA report, the cumulative chance of exclusion for a falsely accused man would be 90 to 95 percent. In other words, this seven-tier testing system should exclude the innocent man 90 to 95 percent of the time and may wrongly include the innocent man as the

biological father 5 to 10 percent of the time. Boonlayangoor, Telischi & Paulsen, *Paternity Blood Testing: Analysis, Interpretation and Selection of a Program to Verify Parentage*, 75 Ill. B.J. 278 (1987). "The *critical factor* influencing the power of these tests is the *number of* systems used." *Id.* at 281. The more systems that are included in the testing program the higher is the likelihood of excluding nonfathers and including the true father. The article cited a study which analyzed the results of paternity tests conducted at Cook County Laboratory, where it was found that by using RCA testing only—ABO, Rh, MNSs, Kell, Duffy, and Kidd, "the number of men wrongly identified as being the father could be as high as 37 percent." *Id.*

It has been recognized that the scientific value of blood testing results is dependent on the skills of the individual administering the test as well as on the numerous procedural safeguards that must be observed.

The discussion in *Little v. Streater*, 452 U.S. 1, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981), demonstrates the importance of the assistance of counsel to defendants in paternity cases. Counsel would function to (1) inform the defendant of the availability of the testing; (2) ensure that both the RCA and HLA tests were performed; (3) analyze the conditions under which the tests were performed; and (4) arrange for an expert to testify as to the test results and any other relevant information.

The record in this case is not clear as to whether the type of blood testing required under the ABA-AMA model was performed. The report which was received in evidence shows that ABO, Rh, MNS, Kell, and Fy tests were performed. The report does not show whether an HLA test was done. If only RCA tests are performed, counsel representing a putative father might be able to challenge the accuracy of the tests.

In *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), decided the same day as the *Little* case, the U.S. Supreme Court held that the right of an indigent parent to appointed counsel in child termination proceedings should be decided on a case-by-case basis.

In the *Lassiter* case, the indigent mother, who was serving a sentence for second degree murder, apparently did not allege

indigency or request the appointment of counsel. Her rights were terminated, and on appeal to the North Carolina Court of Appeals, she claimed indigency and that the due process clause required court-appointed counsel. The appeals court denied her claim, and the North Carolina Supreme Court in turn denied review.

Although *Lassiter* involved the issue of court-appointed counsel in a context other than paternity, the decision has some application to the facts in this case.

The *Lassiter* Court reviewed various contexts in which the right to appointed counsel issue had been recognized: (1) *Argersinger v. Hamlin*, 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972), held that counsel is required before indigent defendants may be sentenced to prison, even if the crime is petty and the term is brief.

(2) *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967), held that in delinquency proceedings where commitment to an institution may result, the juvenile has a right to appointed counsel despite the civil, not criminal, nature of the proceedings.

(3) *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973), held that the appointment of counsel for indigent probationers at a probation revocation hearing must be determined on a case-by-case basis.

(4) *Scott v. Illinois*, 440 U.S. 367, 99 S. Ct. 1158, 59 L. Ed. 2d 383 (1979), held that actual imprisonment differs from the threat of imprisonment, and thus actual imprisonment is the requirement for finding a constitutional right to counsel.

The Court then stated that

[i]n sum, the Court's precedents speak with one voice about what "fundamental fairness" has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

452 U.S. at 26-27.

The Court, basically, promulgated a test to be used in

resolving due process claims regarding the right to court-appointed counsel. Focusing on the three *Eldridge* factors—private interests, governmental interests, and risk of error— the Court wrote:

> The dispositive question . . . is whether the three *Eldridge* factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status.

452 U.S. at 31.

The Court found that a parent's private interests in a termination proceeding are "commanding" and that the risk of an erroneous determination is a possibility:

> [T]he ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation.

*Lassiter v. Department of Social Services*, 452 U.S. 18, 30, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

In evaluating the state's interests, the Court reasoned that

> [i]f, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal . . . .
>
> . . . [T]hough the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession in the respondent's brief that the "potential costs of appointed counsel in termination proceedings . . .

is [*sic*] admittedly *de minimis* compared to the costs in all criminal actions."
452 U.S. at 28.

Beginning with the presumption that the petitioner was not entitled to court-appointed counsel (because she was not faced with even a potential liberty deprivation should her parental rights be terminated), the Court then balanced the *Eldridge* factors against this presumption and found that the decision as to whether due process required the appointment of counsel for indigent parents in a termination proceeding was a decision best left to the trial court, subject to appellate review.

From the *Lassiter* case and from *Little v. Streater*, 452 U.S. 1, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981), it is apparent that under federal due process, the right of an indigent to court-appointed counsel may be found in *either* a civil or criminal context. If a State's paternity process could directly lead to incarceration, *Lassiter* would provide an absolute right to appointed counsel. On the other hand, if incarceration is an indirect consequence, or only a possibility, the *Eldridge* balancing factors must be invoked and balanced against the presumption that counsel will not automatically be appointed if incarceration is not an immediate threat. *Little* seems to hold that the mere *possibility* of incarceration following a paternity determination weighs heavily in favor of appointing counsel.

Numerous state courts have confronted the specific issue of court-appointed counsel for indigent paternity defendants, the majority basing their holdings on principles enunciated in the *Little* and *Lassiter* decisions.

In *Kennedy v. Wood*, 439 N.E.2d 1367 (Ind. App. 1982), the mother, while receiving welfare benefits, commenced an action to have the defendant declared the father of her child born out of wedlock. The plaintiff was represented by the deputy prosecuting attorney, and the indigent defendant appeared pro se. The lower court, finding paternity actions civil in nature, held that no direct deprivation of the defendant's liberty was involved should he be found to be the father of the child, thus leading to the presumption that paternity defendants have no automatic right to court-appointed counsel. The *Eldridge* factors were balanced against this presumption, and as a result,

the court held the due process clause demands not only the appointment of counsel for *all* indigent paternity defendants, but also that "[b]ecause this right would be meaningless if such a defendant did not know of the right, we further hold that the court must advise the paternity defendant in this situation of his right to appointed counsel if he is indigent." 439 N.E.2d at 1372-73.

In the analysis of the *Eldridge* factors, the court focused primarily on the possibility of error should a defendant proceed without counsel. It noted:

> The legislature has recognized the complexity of these proceedings and the importance of their outcome to the State and has afforded the mother and child the assistance of counsel in prosecuting their claim. However, by intervening heavily on behalf of one side, the State has upset the balance of a traditionally private dispute. The chances that the significant consequences of fatherhood will be imposed on the incorrect man dramatically increase if, because he is unable to afford counsel, he offers a legally inept or no defense. . . .
>
> The fact-sensitive nature of the paternity proceedings and the importance of blood tests further demonstrate the necessity for the timely assistance of counsel to ensure that the putative father is apprised of his right to request blood tests and to inform him of their significance. The value of blood tests in exonerating innocent putative fathers has been recognized.

(Citations omitted.) *Id.* at 1371, citing *Little* as well as the joint report of the ABA-AMA recommending the series of seven tests in determining the probability of paternity. The court concluded, stating,

> An indigent defendant's right to a free blood grouping test may be rendered meaningless without counsel to advise him of the right to demand such a test, to explain its significance, to ensure that the test is properly administered and to ensure that the results are properly admitted into evidence.

439 N.E.2d at 1372.

In *Corra v. Coll*, 305 Pa. Super. 179, 451 A.2d 480 (1982), the

defendant, who was named as the putative father of a child born out of wedlock, claimed indigency and sought court-appointed counsel under the federal due process clause. Unlike the court in *Kennedy*, the Pennsylvania court found that despite the civil nature of paternity suits, the threat of future imprisonment (based on a determination of paternity at an earlier proceeding) was significant and was a strong factor in the determination that court-appointed counsel is necessary. The court stated:

> It is our belief that the creation of a parent-child relationship is an example of the type of situation which demands a flexible application of due process. Accordingly, we analyze the due process requirements of *Mathews v. Eldridge* against a strong presumption that court-appointed counsel is constitutionally required for indigent defendants in a paternity proceeding.

451 A.2d at 485. The court also recognized that

> [o]nce paternity is established, that finding is *res judicata* and cannot be relitigated in a subsequent proceeding. . . . Consequently, denial of court-appointed counsel at the initial paternity proceeding may result in defendants being sent to jail without ever having had a meaningful opportunity to be heard on the issue of their paternity.

451 A.2d at 486.

As in *Kennedy*, the *Coll* court noted that because a complainant in a support action, upon request, is entitled to representation by the district attorney, the defendant's need for counsel is readily apparent.

> A paternity proceeding often becomes an adversary contest between a complainant, backed by the resources of a skilled attorney, and the uncounselled accused father. Under these circumstances, the contest is undeniably tilted in favor of the complainant. Since many indigent defendants may be illiterate and unfamiliar with courtroom procedure, that imbalance is exacerbated yet further.

451 A.2d at 487.

The court's analysis of the defendant's private interests resulted in the finding that the creation of a parent-child

relationship and the threat to the defendant's liberty interests should he be found to be the father and ordered to pay support, as well as the potential financial impact on the defendant, were very significant. In noting the potential for erroneous results should the defendant be denied counsel, the court found that the defendant's *access* to free blood testing was not enough and that " 'the importance of blood tests magnifies the necessity for the timely assistance of counsel, to ensure that the defendant is apprised of his right to request blood tests and to inform him of their significance.' " 451 A.2d at 486, citing *Hepfel v. Bashaw*, 279 N.W.2d 342 (Minn. 1979).

The court held the following in regard to the governmental interests at stake:

> Thus, not only the defendant's interest but also the state's interest is best served by a hearing at which a defendant accused of parentage is represented by an attorney. It is furthermore clear that the state's future administrative burdens would be lessened since a correct determination of paternity increases the chance that the adjudged parent will comply with support obligations. Accordingly, while the state will incur the added expense of providing indigents with court-appointed counsel, this expense is outweighed by the salutary aspects of having counsel present at the paternity proceeding.

451 A.2d at 488.

Finally, the court held:

> There is no situation of more monumental importance, or more worthy of due process protection, than the creation of a parent-child relationship. In recognition of this, the legislature has conferred legal representation on a complainant upon the request of the court, or a Commonwealth or local public welfare official. We find no reason why an indigent defendant, accused of parentage, should not also be provided with the assistance of experienced counsel.

*Id.*

In *State, ex rel., v. Toner*, 8 Ohio St. 3d 22, 456 N.E.2d 813 (1983), the mother, an AFDC recipient, had filed a complaint alleging the defendant was the father of her child. The

defendant, an indigent, moved that the lower court appoint counsel, and was denied. The defendant then obtained the services of the American Civil Liberties Union for the sole purpose of asserting his constitutional right to court-appointed counsel. The court, deciding on state and federal due process grounds, found that any indigent paternity defendant facing the State as an adversary must be afforded court-appointed counsel.

In considering the *Eldridge* factors, the court found the private interests to be "substantial" and the state's financial interests as "hardly significant enough to overcome the private interests involved." 8 Ohio St. 3d at 24, 456 N.E.2d at 815. The risk of error concerned the court, as it stated:

> Given the value of the right to blood grouping tests . . . which right could feasibly go unasserted by one unfamiliar with the law, and the likelihood that expert witnesses will be called to testify should blood grouping tests be ordered . . . it appears that one unknowledgeable of his rights and unskilled in the art of advocacy could easily go astray in conducting his defense. It can only be assumed that court-appointed counsel would provide adequate protection against these dangers.

*Id*. Finally, the court held that

> these substantial interests and the integrity of the paternity determination itself could easily be damaged if the appellant herein were to be denied counsel during the proceedings. Emphasizing the fact that the paternity case below was initiated at the state's insistence and prosecuted at the state's expense, we realize that appellant is presented with a formidable task if he should be required to defend himself.

8 Ohio St. 3d at 23, 456 N.E.2d at 814-15. See, also, *Keeney v. Lawson*, 19 Ohio App. 3d 318, 484 N.E.2d 745 (1984), where the court found an indigent paternity defendant constitutionally entitled to state-funded blood testing and counsel, and also found that the rule should be applied retroactively.

In *Lavertue v. Niman*, 196 Conn. 403, 493 A.2d 213 (1985), a mother, assisted by the state, brought an action against a

putative father to establish paternity. The defendant claimed indigency and unsuccessfully moved for appointment of counsel. The defendant, found guilty and ordered to pay support, appealed the decision, arguing the state and federal due process clauses constitutionally mandated the appointment of counsel. The court, citing *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), stated:

> The test that governs the due process right to court-appointed counsel is whether the absence of counsel deprives an indigent defendant of " 'fundamental fairness.' " . . . That test, in turn, involves an analysis of three separate factors: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions."

196 Conn. at 407-08, 493 A.2d at 216.

The court identified private interests of both the putative father and the child, finding that the defendant has a potential loss of liberty if found guilty and later defaults on child support. Both the defendant and the child were found to have significant financial and proprietary interests. The state's interests were found to be conflicting—acting as parens patriae in protecting the child's welfare in assuring that an accurate result is reached, countered with an economic focus toward minimizing costs and time in resolving paternity suits. The state argued that the risk of error was inconsequential should indigent defendants be denied counsel because all defendants have access to blood testing information. The court, unpersuaded by the argument, wrote, "The use of scientific evidence itself may contribute to the risk of error because it increases the complexity of the litigation. The state's provision of counsel for the mother is, in part, a recognition of this fact." *Id.* at 410, 493 A.2d at 218. In summary, the court found the role of attorneys in paternity proceedings to be multifaceted:

> Counsel would alert the defendant of his right to have blood tests performed, advise him about the kinds of tests available and inform him of the procedures that must be followed to obtain accurate results. Counsel would also be able to challenge test results submitted by the state. An

attorney would develop defenses independent of the blood test evidence, such as lack of access to the mother or the existence of another potential father. . . . An attorney would conduct discovery, counsel the defendant on the possibility of reaching a pretrial settlement, subpoena witnesses and conduct cross-examination. The record in this case discloses the likelihood that a pro se defendant's own inartful questioning and failure to obtain witnesses will substantially impair the truth-finding function of the trial court.

*Id*. at 411, 493 A.2d at 218.

Although all of the cases are not in agreement, we believe the better rule is that due process requires that an indigent defendant in a paternity proceeding be furnished appointed counsel at public expense.

Since the plaintiff in this case was not a recipient of public assistance, the state did not *initiate* her paternity action. However, the plaintiff filed her claim pursuant to § 43-512.02, which provides:

(1) Any child, or any relative of such a child, may file with the county attorney, . . . county welfare office, or other county office designated by the Department of Social Services an application for the same child support collection or paternity determination services as are provided to dependent children and their relatives under sections 43-512 to 43-512.10 by the Department of Social Services, the county attorney, and the clerk of the district court.

As a result, the plaintiff was assisted by the Lancaster County attorney's office in prosecuting her claim. Thus, the fact that the state did not *initiate* the suit is irrelevant. The state's involvement on behalf of the plaintiff is obvious throughout the course of the proceedings.

Although Nebraska statutes provide that paternity actions are civil in nature, Neb. Rev. Stat. § 13-111 (Reissue 1983), they have been described as "penal in some aspects." *Lockman v. Fulton*, 162 Neb. 439, 443, 76 N.W.2d 452, 455 (1956).

Even though a defendant's physical liberty is not *immediately* at risk if adjudged to be the father of a child in a

paternity proceeding, he can lose his physical liberty in *later* proceedings which arise out of and are based on the initial paternity determination. Criminal sanctions for nonsupport can attach to "[a]ny person who intentionally fails, refuses, or neglects to provide proper support which he knows or reasonably should know he is legally obliged to provide to a . . . minor child . . . ." Neb. Rev. Stat. § 28-706(1) (Reissue 1985).

Furthermore, Neb. Rev. Stat. § 43-1406 (Reissue 1984) provides that in a child support proceeding, a father may be held liable for support, and "Failure on the part of the father to perform the terms of such decree shall constitute contempt of court and may be dealt with in the same manner as other contempts." As a result, the defendant may be subject to being fined or imprisoned. Neb. Rev. Stat. § 25-2121 (Reissue 1985).

In addition to a potential threat of imprisonment, a determination of paternity in a state-initiated paternity suit would be res judicata and therefore not open to attack in a later proceeding involving collateral issues such as nonpayment of support. A final judgment on the merits by a court of competent jurisdiction is conclusive upon the parties in any later litigation involving the same cause of action. *Graham v. Waggener*, 219 Neb. 907, 367 N.W.2d 707 (1985).

The threat of future incarceration resulting from a finding of paternity is significant in determining the need for counsel. The paternity suit is the only opportunity for the putative father to be heard on the issue. The future threat to the defendant's liberty is significant.

The risk of error should indigent paternity defendants go unrepresented is apparent. Counsel is necessary to inform the defendant of his right to a jury trial, as well as his right to blood testing. Beyond this point, the need for counsel escalates. The assistance of counsel is necessary to assist the defendant in presenting his case by taking pretrial depositions; retaining witnesses, both expert and lay; conducting the defendant's case at trial through direct and cross-examination of witnesses; establishing defenses; and so on. The risk of a one-sided trial where the plaintiff is assisted by counsel highly specialized in the area is undeniable.

The interest of the state is primarily pecuniary and of less

import than the overriding interest of *all* parties, including the state, for an accurate and fundamentally fair determination of paternity.

We conclude that due process requires that an indigent defendant has an absolute right to court-appointed counsel in state-initiated paternity proceedings. The concepts of "fundamental fairness" and "meaningful opportunity to be heard" which are integral to the notion of due process make the right to counsel mandatory.

It is unnecessary to consider the other assignment of error.

The judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.